FILED by _____ 𝒟ℂ ____ D.C

98 MAY 13 PM 12: 36

C... ... ....KE
CLER... U.S. DIST. CT.
S.D. OF FLA.-MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

LUKOIL-LANGEPASNEFTEGAZ,
a Russian Company

      Plaintiff,

v.

YOX WARENHANDELSGESELLSCHAFT
M.B.H., a foreign corporation,
RAMOIL HOLDING COMPANY,
a Cayman Islands Company;
RAMOIL MANAGEMENT COMPANY,
RODOLJUB RADULOVIC, individually, and
JASNA RADULOVIC, individually

      Defendants.

_____/

CASE NO **98 - 8309**
**CIV-MOORE**

MAGISTRATE JUDGE
.... BANDSTRA

## COMPLAINT

1.    Plaintiff Lukoil-Langepasneftegaz ("Lukoil"), sues Defendants Yox WarenHandelsgesellschaft m.b.H. ("Yox"), Ramoil Holding Company ("Ramoil Holding"), Ramoil Management Company, Inc. ("Ramoil Management"), Rodoljub Radulovic and Jasna Radulovic (collectively the "Radulovics") and alleges:

2.    This is an action for the recognition and enforcement of a foreign arbitral award, pursuant to 9 U.S.C. § 203, concerning proceedings falling under the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards.



3.     Venue is proper in Palm Beach County, Florida, as Ramoil Management, Defendant Yox's successor entity, as well as the alter egos of these two entities, are all based in or residents of Palm Beach County, Florida.

## PARTIES

4.     Plaintiff Lukoil is a company organized and existing under the laws of Russia, with an address of 11A Lenin Street, Langepas, Tyumen Region, 626449 Russia. Lukoil is an oil producer.

5.     Defendant Rodoljub Radulovic is an individual *sui juris* residing in Florida at 3132 NE 31st Avenue, Lighthouse Point, FL 33064.  Rodoljub Radulovic is a citizen of the former Yugoslavia, and a permanent resident alien of the United States.

6.     Defendant Jasna Radulovic is an individual *sui juris* residing in Florida at 3132 NE 31st Avenue, Lighthouse Point, FL 33064.  Jasna Radulovic is a resident of the United States.

7.     Defendant Yox was at all relevant times, an Austrian corporation doing business in Russia.  At all material times, the Radulovics, or either of them, were the officers, managing directors, and/or former beneficial owners and/or shareholders of Yox. On information and belief, Yox was absorbed by another entity, Ramoil Management, without compliance with the statutory requirements of merger, and/or Yox continued business as Ramoil Management following its demise.

8.     Defendant Ramoil Holding is organized under the laws of the Cayman Islands as an exempt company for the purpose of doing business outside of the Cayman Islands.  Ramoil Holding has at all material time maintained a business address of Suite 350, 2424 Federal Highway, Boca Raton, Florida 33431.  Ramoil Holding has at all

material time maintained an agent at that address. At all material times, the Radulovics, or either of them, have been the officers, directors and beneficial owners of Ramoil Holding.

9.     Defendant Ramoil Management is a Florida Corporation doing business in Palm Beach County, Florida. Ramoil Management has at all material times maintained a business address of Suite 350, 2424 Federal Highway, Boca Raton, Florida 33431. Ramoil Management has at all material time acted as agent for Defendant Ramoil Holding. At all material times, the Radulovics, or either of them, have been the officers, directors and beneficial owners of Ramoil Management.

## ALTER EGO ALLEGATIONS

10.    All or substantially all of Ramoil Holding's business affairs are conducted by the Radulovics through one or more of the Ramoil Companies[1] inter-changeably. Additionally, the Radulovics regularly operated one Ramoil Company as the alter ego of one or more of the other Ramoil Companies; in particular, Ramoil Management and Ramoil Holding were the alter egos of one another.

11.    By virtue of their ownership of each of the Ramoil Companies and Rodoljub Radulovic's position as Chairman of Ramoil Holding and President of Ramoil Management, on information and belief, at all relevant times (and presently) the Radulovics exercised absolute domination and control over each of the Ramoil Companies and directed the entire business and management of the Ramoil Companies, solely, completely and exclusively, and used each of them, including Ramoil Holding, to conduct their own, personal business.

---

[1] The various Ramoil entities including but not limited to, Ramoil Holding, Ramoil Management, and Yox are collectively referred to as the "Ramoil Companies."

Zuckerman, Spaeder, Taylor & Evans, LLP, Miami, Florida

12.     Upon information and belief, at all relevant times herein Ramoil Holding was a sham corporation. Its sole function was to act as a nominal contracting party for international commodity transactions on behalf of its sole owner and manager, the Radulovics, and as a funnel for the receipt and payment of funds arising from such transactions, the proceeds of which were entirely controlled by the Radulovics and diverted to themselves and/or other Ramoil Companies.

13.     Ramoil Holding, although nominally a Cayman Islands corporation, has no actual physical or business presence in the Cayman Islands, or, on information and belief, anywhere else in the world except to the extent it acts through its alter egos. It has no office facilities, office operations or office employees in the Cayman Islands. It has no telephone, facsimile or business listings in the Cayman Islands telephone book or telephone company.

14.     Ramoil Holding's sole nexus with the Cayman Islands is a nominal post office box address, which is the office address of its incorporating local attorneys, from whose offices Ramoil Holding conducts no business affairs.

15.     Ramoil Holding's sole telephone and facsimile numbers, as shown on its stationery, are the same telephone and facsimile numbers as Ramoil Management in Boca Raton, Florida.

16.     Communications, oral or written, transmitted to or by Ramoil Holding, including communications with Lukoil relative to the transactions referred to herein, were made via Rodoljub Radulovic or Ramoil Management in Florida.

17.     On information and belief, the Radulovics, in the exercise of their domination and control and in order to mislead and defraud the creditors of Ramoil Holding and the other Ramoil Companies:

(i)     authorized and directed the commingling of the payments, receipts and funds of Ramoil Holding between and among themselves and the other Ramoil Companies;

(ii)    in general, conducted the business of the Ramoil Companies as unitary enterprise without making distinctions among the companies.

All of the foregoing had the intent and effect of misleading and deceiving contracting third parties (including Lukoil) and other creditors, and obscuring and concealing the legal responsibility of the Radulovics and Ramoil Holding.

18.     For example, Ramoil Management and the other Ramoil Companies routinely invoiced customers for payments of amounts due in connection with contracts with Ramoil Holding.  Ramoil Management and other Ramoil Companies also received payments from customers for transactions undertaken in the name of Ramoil Holding.

19.     In other instances, Ramoil Management entered contracts in its own name, payment for which was to be made, and in some instances was made, by Ramoil Holding, Conversely, Ramoil Management at other times represented that it was principal in transactions entered in the name of Ramoil Holding.

20.     Similarly, the duties, obligations and benefits of contracts that purported to be between Yox and Lukoil or other third parties were regularly intermingled with Ramoil Holding undertaking the duties or receiving the benefits of such contracts.  Moreover, on information and belief, the funds of Ramoil Management, Ramoil Holding, and Yox were routinely commingled.

21.     Neither Ramoil Holding, nor any of the other Ramoil Companies, was ever sufficiently capitalized or financed to satisfy all of the debts it/they incurred in the course of

doing the Radulovics' business, including the transactions between Yox with Lukoil which was later renegotiated by Ramoil Holding. As a consequence neither Yox, Ramoil Holding nor the other Ramoil Companies possess assets sufficient to satisfy the debts incurred by Yox and the other Ramoil Companies.

22.    In short, Ramoil Holding and the other Ramoil Companies are a unitary enterprise, controlled and dominated by, and utilized as the personal investment vehicle and for the personal benefit of, the Radulovics. The commingling of funds and intermingling of contractual obligations and benefits between and among Ramoil Holding and the Ramoil Companies was undertaken at the direction of the Radulovics in order to mislead and defraud creditors, including Lukoil.

23.    Defendants Ramoil Holding and Yox are also amenable to jurisdiction in Florida because Ramoil Management, Yox, and Defendant Ramoil Holding are alter egos of the Radulovics, to wit:

(a)    Ramoil Holding is so organized and controlled and its business is conducted in such a manner as to make it merely an agent, instrumentality, and alter ego of the Radulovics.

(b)    Ramoil Management is so organized and controlled and its business is conducted in such a manner as to make it merely an agent, instrumentality, and alter ego of the Radulovics.

(c)    Yox was so organized and controlled and its business was conducted in such a manner as to make it merely an agent, instrumentality, and alter ego of the Radulovics.

(d)     Ramoil Holding, Ramoil Management, and Yox have, at all relevant times been controlled, organized, and operated by the Radulovics as overlapping entities and alter egos of each other which do not respect the corporate form and have been used to defraud creditors, including Lukoil.

24.     Defendants Yox, Ramoil Holding and Ramoil Management are or have been engaged in substantial and not isolated activity within Florida, both personally and/or through their agents and/or alter egos.

## COMMON FACTUAL ALLEGATIONS

25.     In 1991, Lukoil, through a Russian state trading organization called V/O Rosvneshtorg ("Rosvneshtorg"), sold 165,018,035 metric tons of crude oil, at the price of $21,215,956.80, to Yox, a company organized and registered in Austria, but controlled by the Radulovics.

26.     The involvement of Rosvneshtorg, the state trading organization, as an intermediary in the transaction, was required by Russian law; however, as reflected by the parties' subsequent conduct and execution of documents, the contract was effectively between Lukoil and Yox for the sale of oil.

27.     The sale of the oil was memorialized in a contract numbered 810/01133175/15075-040/94 ("Contract 810") between Rosvneshtorg and Yox, dated July 7, 1991. Contract 810 contains an arbitration clause that indicated that "arbitration shall be final and binding upon the parties concerned." A copy of Contract 810 is attached hereto as "**Exhibit A.**"

28.     Upon information and belief, an original copy is in the possession of Yox and/or its alter egos. Lukoil has made a diligent effort to obtain the original or a duly

authenticated copy of the original of Contract 810, but due to political events in Russia since this contract was entered into, Lukoil has been unable to obtain the original or a duly authenticated copy.

29.     Contract 810 was signed on behalf of Yox by Defendant Rodoljub Radulovic.

30.     The oil was delivered pursuant to Contract 810 in two F.O.B. shipments in Russia, at the port of Novorssisk, pursuant to bills of lading dated November 13, 1991 and December 17, 1991.

31.     The two shipments of oil arrived, and Yox received the oil pursuant to Contract 810.

32.     Pursuant to Contract 810, Yox was to pay for the delivered oil within 30 days from the date on the bills of lading, *i.e.*, payments were due on December 13, 1991 and January 17, 1992.

33.     Yox did not pay for the oil by the dates required under Contract 810, and never paid in full for the oil.

34.     On March 18, 1992, Yox transferred $6,100,000.00 in partial payment for the oil received pursuant to Contract 810.

35.     On or about October 14, 1992, Yox and Rosvneshtorg signed a Protocol stating that the remaining $15,115,956.80 due pursuant to Contract 810 was due no later than October 31, 1992, with 4% annual interest and a penalty of 0.1% annual interest for each week of delay.

36.     Yox did not pay the outstanding balance for the oil by October 31, 1992, as required by the Protocol.

37.     On November 23, 1992, Yox transferred $1,151,391.76 in partial payment for the oil pursuant to Contract 810 and the Protocol.

38.     On March 30, 1993, recognizing that Rosvneshtorg was merely Lukoil's agent for the oil sale to Yox, Rodoljub Radulovic, on behalf of Yox signed a "Guarantee Letter" in favor of Lukoil.  The Guarantee Letter promised payment for the oil purchased pursuant to Contract 810.  A true and correct copy of the Guarantee Letter, translated from Russian to English, is attached hereto as "**Exhibit B**."

39.     Pursuant to the Guarantee Letter, Yox promised to pay off the debt, in the sum of $15,115,056.80, plus interest, at an annualized rate of 4% and 0.1% for the period of delay, to be paid not later than July 31, 1993.

40.     No payments were made by Yox or Rodoljub Radulovic pursuant to the Guarantee Letter.

41.     On May 18, 1994, Rodoljub Radulovic, on behalf of Yox, sent a telex to Rosvneshtorg, memorializing a conversation between the President of Rosvneshtorg and the Moscow representative of Yox, Dusko Perovic.  This telex recognized the debt and established a payment schedule for the outstanding debt of Yox under Contract 810 ("telex payment schedule").  A true and correct copy of the telex is attached hereto as "**Exhibit C**".

42.     The telex payment schedule called for Yox to pay $2,000,000 each month from May 1994 until October 1994, and $1,800,000 in November 1994.

43.     No payments were made by Yox or Rodoljub Radulovic pursuant to the telex payment schedule.

44.     On information and belief, on May 20, 1994, Rodoljub Radulovic was removed from the Austrian corporate register as the Managing Director of Yox.  On

information and belief, Radulovic's spouse, Jasna Radulovic, remains as the sole shareholder in Yox.

45.     On information and belief, Yox has insufficient assets to meet its debt pursuant to Contract 810 and, on information and belief, is currently capitalized at the minimum amount authorized under Austrian law.

46.     On June 6, 1994, Rosvneshtorg instituted legal proceedings against Yox in the International Commercial Arbitration Court of the Chamber of Commerce and Industry of the Russian Federation ("Moscow Arbitration Court").

47.     On September 7, 1994, Yox transferred $2,500,000 toward payment of the debt under Contract 810.

**48.**     On February 22, 1995, following Rosvneshtorg's assignment of its rights under Contract 810 to Lukoil, Lukoil was substituted in as the plaintiff in the Moscow Arbitration Court proceedings.  A duly certified copy of Rosvneshtorg's assignment of its rights under Contract 810 to Lukoil, along with a certified translation from Russian to English, is attached hereto as **"Exhibit D."**

49.     On March 15, 1995, after a hearing before the Moscow Arbitration Court, Lukoil received a judgment (the "Moscow Arbitration Award") against Yox for $12,162,453.23, plus interest in the amount of 0.1% for each week of delay of payment, beginning September 8, 1994, until the actual date of payment, plus $27,262.00 in arbitration costs.  A duly authenticated certified copy of the Moscow Arbitration Award, along with a certified translation from Russian to English, is attached hereto as **"Exhibit E."**

50.    Neither Yox, nor any of its alter egos has ever made any payments toward the satisfaction of the Moscow Arbitration Award.

WHEREFORE, Plaintiff Lukoil-Langepasneftegaz prays that this Honorable Court recognize and enforce the Moscow Arbitration Court's award against Defendants Yox WarenHandelsgesellschaft m.b.H. and its alter egos, Ramoil Holding Company, Ramoil Management Company, Inc., Rodoljub Radulovic and Jasna Radulovic, in the amount of $12,162,453.23, costs associated with the arbitration proceeding in the amount of $27,262.00, along with pre-judgment interest, costs and such further relief as this Court deems proper and just.

DATED: 12 May 1998

Sharon L. Kegerreis

SHARON L. KEGERREIS
FLORIDA BAR NO. 852732
JENNIFER R. COBERLY
FLORIDA BAR NO. 930466
Zuckerman, Spaeder, Taylor & Evans, LLP
Suite 900, Miami Center
201 Biscayne Boulevard
Miami, FL  33015
(305) 579-0110
Attorneys for Plaintiff,
LUKOIL-LANGEPASNEFTEGAZ

**7** - July 1991

a Confidential mean of between the VAD [illegible] can [illegible]
between on networks to be as "belief" [illegible] and the [illegible]
Confidentiality of [illegible] Conflict [illegible] control
presently hereby it is agreed as follows:

**Subject of Contract.**

Subject to availability and Sellers' request Sellers may
sell and Buyers has bought C.i.F. one safe port of
[illegible] (2 USSR [illegible] See port
approx to 300 000 mt of Crude Oil.

Sellers have the option to deliver plus or minus 10 (ten)
percent of the total contractual quantity.

A mutual agreement part of the goods sold under the present
contract may be delivered on F.O.B. terms. The
terms of F.O.B. delivery to be applied under this Contract are
laid in Enclosure No.1

## 2. Quality.

The goods sold under this contract shall meet the specifications
listed in Enclosure No.2.
The quality of each cargo shall be determined in accordance with
the testing methods in force in the USSR.
Sellers' responsibility with regard to the quality of the goods
delivered is limited to the specification(s) stated in Enclosure
No 2.

## 3. Time of Delivery.

Deliveries are to be effected before 01.12.91 and shall be made
in accordance with the shipping program to be agreed upon between
the parties.
1st quarter - about
2nd quarter - about
The Bill of Lading date is to be considered the date of
delivery.

## 4. Price and Payment.

The price and terms of payment are stipulated in Addenda No.1
and No.2 respectively which form an integral part of the Contract

## 5. Delivery and Acceptance.

The quantity of the goods delivered by Sellers and accepted by
Buyers is as per the Bill of Lading conforming to the
measurements ascertained at the loading port, and the quantity is
as per the Certificate of Quality issued by the laboratory at the
loading port.
The quantity stated in the Bill of Lading is to be considered
final and binding upon both parties.
The right of ownership of the goods and all risks including
accidental loss or damage shall pass from Sellers to Buyers at
the time when the goods pass the tanker's permanent hose
connection at the port of loading.
During loading of the tanker arbitration samples are to be taken
from the end of the shore pipeline according to the standard
procedure currently in force in the USSR. The samples, thus taken
and thoroughly mixed, are to be filled into bottles and sealed.
One part of these samples, filled into not less then two bottles
and sealed by Sellers, is to be placed on board the tanker, care
of the Master, for delivery to Buyers or their nominated receiver
at the discharge port. The other part of the same samples, filled
into not less then two bottles sealed by the Master, is to be
kept by Seller. Both parties are to keep these samples for at
least two months commencing from the date of delivery and in case
of a claim until such time as the claim is settled.

-2-

If there is a dispute concerning the quality of arbitration
amples, the final analysis of the arbitration samples is to be
made by a neutral laboratory in the USSR agreed upon by both
parties in accordance with the testing methods in force in the
USSR. The results of the analysis are to be final and binding
upon both parties.

### 6. Insurance

In respect of any C.I.F. delivery Sellers are to insure the
goods at his own expense for the invoice value of the goods
against usual marine risks including risks of leakage and
shortage exceeding 0.5 per cent, with the Insurance Company of
the USSR (Ingosstrakh) Ltd. in accordance with their Transport
Insurance Rules, para. 2, p.3 for Crude Oil.

At Buyers' special written request (including telex) and at his
expense the goods may be additionally insured against war and any
other risks, as well as for the value above the invoice amount.
At Buyers' written request (including telex) Sellers may insure
the goods shipped on F.O.B. terms with Ingosstrakh at Buyers'
expense in favour of Buyers or Receivers, nominated by them.
The Insurance Policy or Certificate of Ingosstrakh is to be
issued in the name of the Buyers or Receivers and nominated by
them.

Open Insurance Policy will be issued for the whole year,
one to cover the deliveries of Crude Oil and the second for
light Products.

### 7. Terms of Transportation.

a) Latest 45 days prior to the month of shipment Buyers will
notify Sellers of the quantity required in that month. Latest
0 days prior to the month of delivery Sellers will notify Buyers
of the quantity available in accordance with the provisions of
the Contract and Seller's possibilities. 5 days prior to the
commencement of the month of delivery Sellers will notify Buyers
of the shipping schedule for the month, and within two working
days thereafter the shipping schedule is to be agreed
between the parties.

Sellers have the right to arrange shipment of each cargo
in a nine day range.
b) Within the agreed shipping schedule Sellers will advise
Buyers not later than three days prior to each shipment the name
and capacity of the tanker and her expected time of arrival
at the loading port. Upon receipt of the information Buyers will
inform Seller of a safe discharge port.
Sellers will inform Buyers by telex or cable, within 48 hours
after shipment, the loaded details of each cargo.
the Master of the tanker will cable her E.T.A. to Buyers or
his agent at the discharge port 72, 24 and 12 hours prior to
arrival.
Sellers may, with prior notification to Buyers, substitute any
tanker by another similar tanker within operational tolerance of
0 per cent.
c) On the tanker's arrival at the discharge port the
master will give the Buyers' representative written Notice of
Readiness to commence discharge. This Notice may be given at any
time of the day or night unless it is not consistent with local
port regulation.
d) Laytime will commence 6 hours after such Notice of Readiness
is given to Buyers' representative by the Master, berth or no
berth. However, if the tanker is berthed before expiration of 6
hours allowance period, laytime should commence from the moment
of tanker's berthing.

. In the case of discharging at two or more ports, anytime at the second and any further ports of discharge will commence from the time of giving the Notice of Readiness to Buyers' representative. The counting of time utilized for discharge will be stopped at the moment of disconnecting hoses, or from the moment when owner's (receiver's) discharge documents are issued, whichever shall occur later.

Sundays and Public Holidays unless used, time during which weather conditions prevent discharge, time of shifting from anchorage to berth, and time during which discharge is prevented due to technical and\or other conditions attributable to the tanker, will not be counted as laytime. However, upon expiration of the time allowed for discharge, Sundays and Public Holidays will be counted as laytime irrespective of their utilization, as well as the time when weather conditions prevent discharge.

e) For a tanker of           deadweight and above the time allowed for discharge is 36 running hours. If the goods are shipped by tankers of less deadweight the time allowed for Buyer's discharge is fixed as follows:
tankers up to    6499 d.w.t.      12 running hours
               6500 - 19499 d.w.t.    24 running hours

The expenses of shifting from one berth to another, if any, at the discharge port will be paid by Buyer and time used will be counted as laytime.

If the tanker discharges for two or more Buyers, the total time allowed will be divided proportionally in accordance with the Bill of Lading quantities discharged to each Buyer.

f) Demurrage will be paid in accordance with the following demurrage rates stipulated in Preamble Part C of New Worldwide Tanker Nominal Freight Scale "New Worldscale".

These rates of demurrage are to be adjusted by latest "Average Freight Rate Arrangement" (AFRA) index available on the Bill of Lading date for a tanker of the same size.

. If the goods are shipped by tankers of less deadweight than that stipulated in "New Worldscale"

for anypart of the running day):

|        |   |        d.w.t.   |               |
|--------|---|----------------|---------------|
|        |   | 2499 d.w.t.    | US Dollars 3990 |
| 2500 - |   | 3499 d.w.t.    | US Dollars 4180 |
| 3500 - |   | 4499 d.w.t.    | US Dollars 4390 |
| 4500 - |   | 6499 d.w.t.    | US Dollars 4600 |
| 6500 - |   | 8499 d.w.t.    | US Dollars 4820 |
| 8500 - |   | 10499 d.w.t.   | US Dollars 5040 |

Demurrage rates to be paid will be adjusted by 15% per cent after three days from the moment laytime commences and by 200 per cent after feve days from the moment laytime commences, however excluding the circumstances defined in Clause "9 Contingences" of the Contract.
The demurrage claim to be presented within 14 months after the Bill of Lading date. Demurrage must be paid within three months of receiving the Seller's claim duly supported by the relevant documents.

g) In the event of discharging (with Sellers' consent) at two or more ports, Buyer will pay Seller extra freight for each additional port of discharge at a rate of US Dollars        per ton of the tanker's deadweight with the following exeption:

-4-

| Product | Tanker's deadweight | Rate at US Dollars per ton |
|---|---|---|
| Crude Oil | 100-145 about | 0,40 |
| Crude Oil | 80-100000 about | 0,50 |
| Crude Oil | 60-80000 about | 0,80 |

for ports Omisalj/Rijeka only Sellers are responsible on for the total quantity of cargo which is to be equal to the sum of the quantities under all Bill of Lading issued in respect of above tanker.

h) If the tanker is discharged for to or more Buyer at one or more ports, all claims for the short delivery, if any, to be settled directly between the Buyers of all lots of the goods.

   i) In view of non-availability of the originals of the Bill of Lading on board the vessel the goods at the discharging port will be released by the Master of the vessel against presentation to him of Letter of Indemnity arranged by Buyer (Enclosure No 5.)

   j) Buyer guarantee that Shipowners and Sellers will not be liable for any losses, damages and expenses occurred while fulfilling instructions given to the Master of the tanker by Buyers or their clients or by Sellers (at Buyers' request) in respect of cargoes released without presentation by Receiver of the original Bill of Lading on condition that Shipowners fulfilled all instructions with due care and respect.

   k) Buyers undertake, if so required by Sellers, to provide Statement of Facts, Time-Sheet, Notice of Readiness, Certificate of Discharge, Certificate of Refining or any other similar documents signed by an appropriate authority.

   l) Terms of tranportation by pipe-line "Adria" are stipulated in Enclosure No.5.

## 8. Claims.

   If the quality of the arbitration sample does not conform to the contract specification, claims for quality are to be submitted to Sellers within two months from the date of delivery. Any claims received after that date will not be considered by Sellers and Buyers will have no right to apply to the arbitration.

Buyers can only submit claims to the Insurance Company for short delivery, including leakage of the goods, if these exceed 0,5 per cent of the weight stated in the Bill of Lading.

   A claim made by the Buyers for the total lot of the goods, or a part thereof, does not give Buyers the right to suspend the discharging of the cargo or to reject this quantity and\or any other quantity of this Contract.

## 9. Contingencies.

   Should any circumstances arise which prevent the complete or partial fulfillment by either party of their respective obligations under this Contract (except failure to pay any sum which has become due under the provisions hereof), namely: fire, ice conditions or any other acts of the elements, war, military operations of any character, blockade, prohibitions of export or import or any other circumstances beyond the control of either party that have arisen after the conclusion of the Contract, the time stipulated for the fulfillment of the obligations shall be extended for the duration of the period during which the above circumstances last (but not more than 20 days).

If the above circumstances last for more than 20 days, any
livery or deliveries which are to be performed under the
ntract within that period may be cancelled on the declaration
either party. If the above circumstances last for more than 40
ys each party shall have the right to discontinue any further
ifillment of their obligations under the Contract.

In such cases neither party shall have the right to make a
aim on the other party for compensation for any possible
mage.

Any claim to Ingosstrakh in respect of any separate part of it
r not accepted and is not subject to consideration.

The party for whom it becomes impossible to meet their
ligations under this Contract shall immediately advise the
her party regarding the beginning and the termination of the
rcumstances which prevent the fulfillment of its obligations.

Certificates issued by the respective Chamber of Commerce
all be sufficient proof of such circumstances and their
ration.

### 10. Arbitration.

All disputes or differences which may arise out of this
ntract, or in connection with it, will be settled without
course to the General Courts of Law, in the arbitration order
the Arbitration Court of Law at the USSR Chamber of Commerce
d Industry in Moscow, in conformity with the rules and procedure
this Court and is stipulated in para.83 of General Terms and
nditions of Goods Deliveries between the Organization of the
SR and SFRY valid from 05..03.78.
e awards of this Arbitration shall be final and binding upon
th parties concerned.

Both parties agree that Soviet Law will be applicable to all
sputes and differences.

### 11. Other Conditions.

a) Neither party is entitled to transfer their rights and\or
ligations under this Contract to a third party without the
her party's previous written (including telex) consent.

b) Shipments and transshipment in any form to Israel,
blic of South Africa and Chile are prohibited.
Buyers undertake that the goods purchased will not be
sposed of by way of resale, exchange, loan or any other
rangement for supply to any ports other than mentioned in
ause "1. Object of the Contract". Otherwise Sellers have the
ght to suspend delivery and no claims will be made in this
nnection. Sellers reserve the right to claim damages caused by
ch infringement.

By mutual agreement the cargo my be discharged at the other
rt of discharge range than that stipulated in Clause "1. Object
the Contract". In this case Sellers reserve their rights for
ice adjustment i.e., the price basis, freight charges or
eight differentials, cost of insurance as well as payment terms
ich they consider as appropriate for such delivery.

c) If buyers fail to take full of partial delivery of their
nthly contractual allocation with regard to the previously
reed shipping schedule, Sellers will have the right to deduct,
their discretion, the quantity not taken from the total
ntracted quantity.

d) Exept as expressly provided in the agreement, neither
e Seller nor the Buyer shall be liable for consequential,
direct or special losses or special damages of any kind arising
t of or in any way connected with the performance of or failure
perform the agreement.

-6-

e) After signing the present Contract all previous negotiations and correspondence between the parties in such connection will be considered null and void.

f) All amendments and additions to the present Contract are valid only if they are made in writing and signed by both parties.

All attached enclosures duly signed are an integral part of this Contract.

g) Buyers will ensure timely acquisitions of any necessary export licences for the goods being the subject of this Contract.

h) all taxes, customs and other duties connected with the inclusion and execution of the present Contract levied in the USSR, except expenses connected with payment as per Addendum No 3 to this Contract, will be paid by Sellers. All taxes and\or duties levied outside the USSR will be paid by Buyers.

i) The USSR is regarded as the place of conclusion and fulfillment of this Contract.

j) This Contract is signed in two originals, for buyers and the other for Sellers, both originals being equally authentic.

k) Buyers' consent is not required in respect to transfer of Seller's rights and/or obligations under the contract to other Soviet organizations in case such transfer takes place by the decision of the competent Organizations of the USSR.

In this case Sellers undertake to notify Buyers about it in written form.

### 12. Legal Addresses:

SELLERS - V\O "ROSVNESHTORG", USSR, 123242 MOSCOW,
     8\5 Barrikadnaya str.,
     Telex: 411060 ROSST  Telephone: 254-80-50, 254-13-83
BUYERS - "YOX - Warenhandels G.m.b.H.", Wulfengasse  10 ,
     A - 9020, Klagenfurt, Austria
     ·Telex: 422794  YOX A Telephone: 0463/36531

SELLERS

BUYERS

-7-

Loading will be considered completed and laytime will cease on the disconnection of delivery hoses.

Sundays and Public Holidays will be excluded from the calculation of laytime unless used.

Time during which shipment could not be effected because of weather conditions or for reasons beyond Sellers' control such as waiting for and proceeding of sanitary, border and custom inspections, pilotage, mooring and other actions while proceeding from the anchorage to the berth, waiting for Free Pratique, discharging ballast, and time during which shipment could not be effected owing to technical and other conditions attributable to the tanker, will not be counted as laytime.

However upon expiration of the time allowed for loading Sundays and Holidays are also included in the laytime irrespective of their utilization as well as the time of stormy weather preventing loading.

g) Sellers will be allowed 36 hours to complete loading a cargo. In case two or more Buyers charter one tanker for lifting of petroleum Products Seller will be allowed 5 hours to complete loading and discharge - 72 hours - is to be considered reversible.

However, the Sellers are released from the payment of demurrage if the total time used for tanker's loading and discharging does not exceed the time allowed for the above operations.

h) Demurrage will be paid on Buyers' demand per running hour and pro rata for a part thereof at the rate stipulated in the Charter Party for each shipment but not more than at the rate stipulated in the preamble part C of this new "Worldwide Tanker nominal Freight Scale"(NEW WORLDSCALE) valid for the period of shipment and adjusted by latest "Average Freight Rate assessment"(AFRA) index available on the Bill of Lading date for tanker of the same type and capacity.

Any demurrage claims must be present to Sellers within six months from the Bill of Lading date, otherwise claims will be declared null and void. Demurrage must be paid within 3 months of receiving Buyers' claim duly supported by the relevant documents.

i) Buyers undertake, if so requested by Sellers, to provide statement of Facts, Time-Sheet, Notice of Readiness, Certificate of Discharge, Certificate of Refining, Charter Party or any other documents signed by an appropriate authority, including copy of L/C and SNE telex with confirmation of the delivery.

SELLERS                                  BUYERS

-7-

ENCLOSURE No. 3

To Contract No. 810/1133175/15075 - 040/04
dated "7" July 1991

Terms of F.O.B. Delivery

a) Latest 45 days prior to the month of shipment Buyers will
notify Sellers of the quantity required in that month. Latest
0 days prior to the month of delivery Sellers will notify Buyers of
he quantity available in accordance with the provisions of the
ontract and Sellers possibilities. Latest 15 days prior to the
ommencement of the month of delivery Buyers will notify Sellers
f their lifting program in conformity with the quantity
onfirmed by Sellers. 5 days prior to the commencement of the
onth of delivery, Sellers will notify Buyers of the shipping
chedule and within two days thereafter the shipping schedule
be agreed between the parties. In the lifting programme
y shipping date will be indicated with four days range.
 - b) Buyer, in accordance with the shipping schedule agreed by
both parties, are to cable or telex to Sellers not later than 10
ays prior to arrival of the tanker at the loading port the name,
apacity, flag and drought of the vessel, approximate date of her
rrival  and the port of destination. Buyers are entitled, at
heir option, to lift 10(ten) per cent more or less of the
uantity of each shipment. Furthermore the Master will cable or
elex to Sellers or to the shipowners' agent at the loading port
he tanker's E.T.A. 96 hours prior to her arrival stating
apacity, flag and drought of the vessel, quantity of clean or
dirty ballast on board, and precise time of the tanker's arrival
8, 24 and 12 hours before her arrival at the port of loading.
Buyersmay with prior notification to Sellers substitute any
anker with another simillar tanker is to be built not earlier
han 1970.

Sellers will inform Buyers by cable or telex loaded details
ach cargo within 48 hours after shipment.
If the arrival of the tanker is delayed by ten days from ETA
rainall.
c) Buyers will ensure the timely arrival of their chartered
essel at the loading port, within the agreed shipping schedule,
he vessel being in every respect ready to load the cargo for
hich she is nominated. otherwise Sellers will be released from
esponsibility for any demurrage incurred and will have the right
o reject such shipment. However, Sellers will take all measures
n their power to effect loading of the tanker as soon as
ossible, advised, Sellers have the right to reject such
hipment.
In all cases of delay in delivering the goods and of
emurrage incurred by the untimely receipt of the above
otification, and\or the late arrival of the tanker, Sellers are
eleased from responsibility for such delay in delivering the
oods and from demurrage. Furthermore, Buyers cannot claim
amages incurred against Seller for late delivery.
d) Buyers' tankers should, in all respects, comply with the
egulations in force at the loading port, such as measurements,
ballasting and loading capacity, safety etc., otherwise all
amages and extra costs which Sellers may incur will be borne by
uyers.

e) On arrival at the port of loading after receipt of Free Pratique, which ever is earlier, the Master or his agent is to give to the Sellers' representative written notice of readiness of his vessel for loading the goods.

Notice may be given at any time of the day or night unless it is not consistent with the local port regulations.

If full free Practique is not received within 6 hours and the tanker is ready for loading the Master has the right to make a protest and hand in Notice of Readiness.

1) Laytime will commence 6 hours after such Notice is given by the Master, berth or no berth. In the case of loading at two or more ports laytime at the second and subsequent ports will commence from the moment Notice of Readiness is handed in.

-9-

ENCLOSURE No. 3
TO CONTRACT *No 810/1133175/15075-040/04*    *7. July 1991*

LETTER VOF INDEMNITY

e: . . . . . . . . . . . . . . . . . . . . . . . .  (name of vessel), Bills of Lading
ated . . . . . . . . . . . . . . metric tons of . . . . . . . . . . . . . . . . .
. . . . . . . . . . . . . . . . . . . . . . . . . .
e, V/O "Rosvneshtorg" herewith guarantee to hold you harmless
nd to indemnity. . . . . . . . . . . . . . . . . . . (Buyers'name) against all
laims, cost and consequences which may arise from the fact
nat. . . . . . . . . . . . . . . . . . . . . . . . . (Buyers' name) are paying us the
alue of the above cargo, i.e. . . . . . . . . . . . . . . . . . . . . without
aving in hand the documents, especially three original Bills of
ading.
/O "Rosvneshtorg" engage irrevocably to deliver directly to
. . . . . . . . . . . . . (Buyers' name) full set of usual shipping
ocuments, including especially three originals Bills of Lading,
pon as these documents have been received from our suppliers.
his Letter of Indemnity shall automatically expire upon our
resentation of shipping documents to your Bank through the Bank
or Foreign Economic Affairs of the USSR, Moscow.

SELLERS                          BUYERS

–10–

ENCLOSURE No. 4
To Contract No. 810/1133175/15075 - 040/04
Dated 7 July 1991

LETTER OF INDEMNITY

To the owners, agents and master of the

Gentlemen,
In consideration of your delivering to us or to our order the
cargo of........ ............ ....... ..... shipped at
........ .......... per... .................. and consigned to
........................... the Bills of Lading for which have
not yet arrived.

We hereby undertake to surrender such Bills of Lading to you if
and when they come to hand, and to hold you and each of you
harmless, and keep you and each of you indemnities against all
claims which may be made upon you and each of you or any of you,
under said Bills of Lading, or any one of the set of wich they
form part, and against all loss, costs (including costs as
between attorney or solisitor and client), damages and expences,
which you or any of you may suffer, or be put to by reason of the
delivery of the said goods to us. Any claims or disputes arising
hereunder shall be subject to the Jurisdiction of the Maritime
Arbitration Commission in Moscow, the USSR, and Soviet Law shall
be applied.

Your faithfully,
We join in the above guarantee

SELLERS

BUYERS

-11-

ADDENDUM No 2

to Contract No.810/01133175/15075-OYO/...

OSCOW                                    " 7 "  July        1991

Payment for the goods sold under the present contract is to
e effected out of an irrevocable Letter of Credit to be opened
y Buyers in favour of Sellers with a Bank correspondent of the
ank for Foreign Trade of the USSR, Moscow, for the full value of
ach lot of the goods to be shipped plus or minus 10(ten) per
ent, validity of the Letter of Credit 45(forty five) days (granted
eferred payment plus 15 days).

The Letter of Credit is to be opened not later than 10 days
efore the tanker's arrival at the port of loading. All expenses
n connection with the opening, amendment, and utilization of the
ter of Credit will be paid by Buyers.

If Buyers fail to instruct their bankers to open the Letter
f Credit or should their bankers open it later than as stated
bove and\or incorrectly they are to pay Sellers a fine for each
ay of delay, but not more than 20 days, at the rate of 0,1 per
ent of the value of the Letter of Credit, and Sellers have the
ight not to load the tanker pending the opening of the Letter of
redit.

Should the delay in the opening of the Letter of Credit
xceed 20 days Sellers have the right to refuse to deliver the
oods which were to be paid out of the Letter of Credit.

If it is necessary for any reason to amend the Letter of
redit, Sellers will advise Buyers of such required amendment.
uyers will instruct their bankers to amend the Letter of Credit
n accordance with Sellers' requirements.

all damages incurred by Sellers in connection with delay
nd\or incorrect opening or amendment of the Letter of Credit by
uyers including damages caused by delay of the tanker and
ayment of deadfreight will be repaid by Buyers.

Sellers grant Buyers a deferred payment for the goods
days from the Bill of Lading date.

Payment out of this Letter of Credit will be effected
n US Dollars.

The amount will be credited to the account indicated by
ellers' Bank on the precise value date stipulated by the
ontract Terms.

In the case of incorrect payment or delay in payment Buyers
ill pay Sellers interest for each day of delay at the London
nterbank Offered Rate(LIBOR) plus two per cent on one month
eposit in US Dollars in London at the opening of the market on
he date when payment of the invoice amount should have been
ade. The rate will be applied on the basis of data published by
he Currency Service of the Reuter Agency.

Payment is to be effected against presentation by Sellers to
he Bank for Foreign Trade of the USSR,Moscow, of the following
ocuments:

1. Commercial Invoice - in triplicate.
2. Bill of Lading - 3/3 originals plus one non-negotiable
opy issued "to order" indicating "freight prepaid" (in case of
IF delivery), "shipped on board".
3. Certificate of Quality.
4. Insurance Policy (in case insurance is effected by
ellers).

- 12-

5. Time-Sheet (in case of FOB delivery).

If Buyers fail to instruct their bankers to issue a Bank

delay but not longer than 30 days, at a rate of ... per diem of the contract.

* If the delay in issuing the Bank Guarantee exceed 30 days, sellers have the right to refuse to deliver the goods the payment or which was to be secured by this Bank Guarantee.

* If it becomes necessary to discharge the cargo at the port or within range) other than that stated in the contract, Buyers, upon receipt of the written (including telex) confirmation from the Sellers, should immediately (but not later than two working days after the date of such confirmation) instruct their bankers to make all necessary amendments to the Bank Guarantee.

All damages incurred by Sellers in connection with delay and/or incorrect issue of the Bank Guarantee, including specifically damages caused by delay of the tanker and payment of deadfreight, will be compensated by Buyers.

This Addendum is an integral part of
Contract No                    dated " "
and all other terms and conditions remain unchanged.

SELLERS                BUYERS

= 13 =

ENCLOSURE No. 3

to Contract No. 810/1133175/15075-OYg/04 dated 7. July 1991

ONLY IN ENGLISH

TEXT OF A LETTER OF GUARANTEE

on

the BANK for Foreign Trade of the USSR, Moscow.

We hereby, irrevocably and unconditionally undertake to pay
V/O "Rosvneshtorg", Moscow, on your first simple demand
the amount        (amount in currency, in
wording) PLUS\MINUS 10% DUE TO V\O "Rosvneshtorg", Moscow,
if NOT PAID AT MATURITY, i.e.
        days after B\L date BY

MESSRS.                          (name of the firm, full
address) relating to the SHIPMENT of          Metric Tons
(Barrels) PLUS\MINUS 10% of
WITHIN...............(month, no specified date to be indicated)
     AS PER CONTRACT
(ADDENDUM) No.                    ;  between V/O "Rosvneshtorg",
Moscow, and MESSRS.

7.

The amount shall be credited to the account indicated by the
Bank for Foreign Trade of the USSR on the precise value date
stipulated by the Contract terms. If the value date falls on
Saturday or a bank holiday other than Monday, then payment will
be made on the preceding banking day. If the due date falls on
Sunday or a Monday bank holiday, the payment will be made on the
next banking day.

This Letter of Guarantee No.             is valid from the
date of its issue until final payment is made, but not later than
5 days after B/L date.

Expenses in connection with the opening, amendment and
utilization of the Letter of Guarantee are to be paid by Buyers.

The advising bank is requested to notify the beneficiary
without adding their confirmation by letter under telephone
advice within 24 hours after receipt of this letter.

Signature of the Bank

SELLERS                          BUYERS

-14-

ADDENDUM No. 1

To Contract No. 810/01133175/15075- 040/04

dated " 7 " July 1991

Moscow

V/O "Rosvneshtorg", Moscow as Sellers on one part and "YOK-Warenhandels G.m.b.H.", as buyers, on the other part, have agreed as follows:_

1. The price for SEBCO sold under the present contract is understood to be CIF one safe port of        in US Dollars per barrel at the basis density of 32,00-32,09 degrees API.

Should the actual density be above or below the basic limit of density the price is to be increased by US Dollar 0,0003 per for each full tenth part of degree API above 32,00 degrees API or to be decreased by US Dollar 0,0003 per barrel each full tenth part  of degree API  below 32,09 degrees API.

2. The price for each cargo is to be agreed on a cargo by cargo basis or the price may be established for the whole month as per agreement of the both parties.

3. Both parties will **agree** on a price latest seven days prior to the date of loading.

4. If the parties fail to agree on the price during a month of delivery, the quantity of SEBCO to be delivered during this period of non-agreement will be deducted from the total contacted quantity.

5. The unit price will be applied to net quantity of SEBCO loacs /water and sediments to be excluded/.

6. For the delivery of SEBCO within 1991 CIF price is fixed for each cargo as follows:

Brent (dtd) as published by "Platt's Crude Oil Marketwire" minus or plus the agreed differential with escalation by API.

This Addendum is an integral part of the Contract No. 810/01133175/15075 - 040/04 dated    July 1991 and all terms and conditions remain unchanged.

SELLERS

BUYERS

ENCLOSURE 2
QUALITY

The goods sold under this Contract shall meet the following specifications:

### SOVIET BLEND CRUDE OIL

1. Density at 20 degrees C, g/cm3 , max ............ 0.870
2. Sulphur content % %, max ............................. 3.8
3. Paraffine content, %%, about ........................ 6.0
4. Water and sediments content, %%, max .............. 0.2
5. Distillation, -%%, volume :
      up to 200 degrees C,   about ............. 21
      up to 300 degrees C,   about ............. 41
      up to 350 degrees C,   about ............. 50

6. Salts content, mg/l max ............................. 100

GELLERS

SELLRS

BYERS

V.O Langepasneftegaz
General Director
Mr. Maganov R.U.

Moscow 3/30 93

## LETTER OF GUARANTEE

Pursuant to the crude delivery agreement of July 10, 1991, we have received 165,000 metric tons of crude through V/O Rosvneshtorg. We have paid a sum of US $6,100,000 for the crude delivered, also through V/O Rosvneshtorg. For reasons well known to you, we have failed to pay the sum of U.S. $15,115,056.80.

We hereby guarantee to pay off, not later than July 31, 1993, the sum of US $15,115,056.80 plus interest at an annualized rate of 4% and .1% for the period of the delay, said amount to be paid directly into your account and at your request.

In view of the fact that our firm hereby assumes the above obligation, your company should reduce its claim against V/O Rosvneshtorg by the aforementioned amount plus the appropriate interest less .6% commission due to V/O Rosvneshtorg for services rendered.

YOX-GmbH President

R. Radulovic

I, Ilya D. Levin, professional translator, residing at 430 M St., S.W., # N-202, Washington, D.C., hereby certify that the foregoing is a true and faithful translation of the original document.

Signature

Subscribed and sworn to, before me this ___6___ day of _____ 19_9_6

**HARRIS S. AMMERMAN**
Notary Public, District of Columbia
My Commission Expires November 14, 1998



**YOX** WARENHANDELSGESELLSCHAFT
M. B. H.

Spitalgasse 4, A-9020 Klagenfurt
Predstavitelstvo v Moskve · 103104 Moskva, M. Bronnaja 19

ПО "ЛАНГЕПАСНЕФТЕГАЗ"
ГЕНЕРАЛЬНОМУ ДИРЕКТОРУ

г-ну МАГАНОВУ Р.У.

МОСКВА, 30.03.93

ГАРАНТИЙНОЕ ПИСЬМО

В соответствии с договором по поставке сырой нефти, подписанным 10 июля 1991 года, нам было поставлено через ВО "Роснефтторг" 165.000 тонн сырой нефти. Через ВО "Роснефтторг" за эту нефть мы оплатили сумму, равную 6.100.000 долларов США. Сумму, равную 15.115.056,80 долларов США мы не оплатили по известным Вам причинам.

Этим письмом мы гарантируем, что сумму, равную 15.115.056,80 долларов США, увеличенную на 4% годовых и 0,1% за каждую неделю задержки, мы обязуемся оплатить не позднее 31 июля 1993 года непосредственно на Ваш счет и по Вашему требованию.

Поскольку наша фирма, таким образом, вступает в долговые отношения, то Ваша фирма должна снизить свою претензию в отношении ВО "Роснефтторг" касательно вышеуказанной суммы плюс соответствующие проценты за вычетом 0,6% комиссионных ВО "Роснефтторг" за оказанные услуги.

Президент фирмы
"YOX-GmbH"

РАДУЛОВИЧ Р.

YOX
Warenhandelsgesellschaft m. b. H.
Wulfengasse 10
A-9020 Klagenfurt
Tel. 0463 r 50531, Tx 42 2794 YOX A

Telefon (095) 203 4810 · (095) 203 3839      Fax (095) 2302519      Telex 413761 yoxmo su

```
*** 18.05.94  17:51
8644110604
411060A ROST SU
422794 YOX A
```

LFD. NR. 14159  18.05.94  17:51

V/O'' ROSVNESHTORG ''
ATTN. MR. PRESIDENT BRJUHOVECKI VLADIMIR FJODOROVICH
------------------------------------------------------------

DEAR MR. PRESIDENT ,

IN ACCORDANCE TO YOUR CONVERSATION WITH THE DIRECTOR OF  OUR
REPRESENTATIVE OFFICE, MR. DUSKO PREOVIC, ON FRIDAY, MAY 13,
1994, WE WOULD LIKE TO INFORM YOU OF THE SOLUTION FOR THE PROBLEM
WITH YOUR COMPANY. . AT THIS TIME THIS APPEARS TO BE THE ONLY
POSSIBLE WAY OF SOLVING IT. WE WIL DO AS FOLOWOWS:
UNTIL END OF MAY  1994 —  2 MIO. USD
       ''        JUNE 1994 —  2 MIO. USD
       ''        JULY 1994 —  2 MIO. USD
       ''        AUGUST 1994— 2 MIO. USD
       ''        SEPTEMBER 1994 — 2 MIO. USD
       ''        OCTOBER 1994 —  2 MIO. USD
       ''        NOVEMBER 1994 — 1,8 MIO. USD

BEST REGARDS

YOX GMBH, KLAGENFURT
PRESIDENT
R. RADULOVIC
422794 YOX A
411060A ROST SU

19/05 '94  10:15   FAX =9587649          RAMOIL — MOSCOW

**МЕЖДУНАРОДНЫЙ КОММЕРЧЕСКИЙ АРБИТРАЖНЫЙ СУД**
**при Торгово-промышленной палате Российской Федерации**

**Дело N** 179/1994

## Р Е Ш Е Н И Е

**г. Москва**                                    "15" мая  1995 г.

Международный коммерческий арбитражный суд при Торгово-промышленной палате Российской Федерации в составе:

председателя  Е. А. Суханова
и арбитров    С. Н. Лебедева и И. И. Гайдаенко

рассмотрел в заседании 15 мая 1995 года

**дело по иску** Б/О "Росвнешторг", Москва, Россия,  к фирме "Йокс Варенхандельсгезельшафт МБХ", Клагенфурт, Австрия, о взыскании долл. США 14.662.453-23

В заседании по делу приняли участие:

представители истца:  Л. А.  Афанасьева /доверенность от  15  мая 1995 г. /,  Д. А.  Тимонин  /доверенность  от 31 января 1995 г.  N 34/46/ .
представители ответчика:  повесткой от 23 марта 1995 г. ответчик был извещен о времени и месте проведения заседания, однако в заседании представлен не был
другие лица: Докладчик Л. П. Чуракова

Обстоятельства дела

6 июня 1994 г. в Международный коммерческий арбитражный суд при ТПП РФ было подано исковое заявление В/О "Росвнешторг", Москва, к фирме "Йокс Варенхандельсгезельшафт МБХ", Клагенфурт, о взыскании долл. США 14.662.453-23, составляющих неоплаченную стоимость поставленного ответчику товара, и о возложении на ответчика расходов по арбитражному сбору.

В исковом заявлении указано, что в соответствии с заключенным сторонами контрактом N 810/01133175/15075-040/04 от 7 июля 1991 г. истец поставил ответчику 165.018,035 мт сырой нефти на сумму долл. США 21.215.956-80. Поставка товара была произведена двумя партиями в ноябре-декабре 1991 г. на условиях ФОБ - порт Новороссийск /коносаменты от 13 ноября 1991 г. и от 17 декабря 1991 г./.

Согласно условиям Контракта ответчик должен был оплатить поставленный ему товар в течение 30 дней с даты коносаментов, т.е. до 13 декабря 1991 г. и до 17 января 1992 г.

Ответчик 18 марта 1992 г. перечислил на счет истца сумму долл. США 6.100.000-00, остаток - долл. США 15.115.956-80 подлежал уплате согласно подписанному сторонами 14 октября 1992 г. Протоколу не позднее 31 октября 1992 г. с начислением 4% годовых. На 31 октября 1992 г. сумма платежа с процентами составила долл. США 15.614.783-37. В случае просрочки в уплате указанной суммы ответчик согласился уплатить пени в размере 0,1% за каждую неделю просрочки.

23 ноября 1992 г. ответчик в счет оплаты товара перевел истцу долл. США 1.151.391-76, а оставшаяся задолженность долл. США 14.662.453-23 на день заявления иска не была погашена ответчиком.

Считая свое право нарушенным, истец обратился с вышеуказанным иском в МКАС при ТПП РФ согласно п. 10 контракта.

Отзыва на иск от ответчика не поступило.

22 февраля 1995 г. Арбитражным судом получена копия Согла-

- 3 -

шения от 21 февраля 1995 г. о переуступке прав, согласно которому истец по делу - В/О "Росвнешторг" уступил Акционерному обществу открытого типа "Лукойл-Лангепаснефтегаз" все права требования по контракту от 7 июля 1991 г.  Согласие ответчика на указанную уступку прав было выражено в его письме от 15 февраля 1995 г., адресованном истцу.

Дело было назначено к слушанию на 15 марта 1995 г.  В день слушания дела Арбитражным судом были получены Дополнения и изменения к исковому заявлению за подписью представителя АООТ "Лукойл-Лангепаснефтегаз".

Как указывалось в этом документе, ответчик после подачи искового заявления выплатил истцу сумму 2,5 млн.долл.США и таким образом сумма основного долга должна быть соответственно уменьшена.

Ссылаясь далее на переписку между сторонами, имевшую место до слушания дела, представитель истца отметил, что ответчик, несмотря на неоднократное признание своей задолженности истцу, в своих письмах от 29 января и 4 ноября 1993 г. объяснял неуплату долга введением Австрийским правительством эмбарго на операции по счетам югославских граждан и контролируемых ими компаний в связи с принятыми Советом Безопасности ООН резолюциями 757 от 30 мая 1992 г. и 820 от 17 апреля 1993 г. Хотя, как пояснил представитель истца, компания "Йокс" и находилась в собственности югославских граждан Р.Радуловича, являвшегося президентом компании, и его жены Я.Радулович, которой в настоящее время принадлежит 100% компании, такие компании не подпадают под эмбарго, поэтому приведенный выше довод ответчика не может быть признан обоснованным. Исходя из изложенного, представитель истца считает, что ответчик имел возможность произвести полностью оплату товара как до введения санкций ООН и Австрийского правительства в 1992 г., так и в период действия упомянутых санкций, так как они не ограничивали операций компании, однако ответчик не использовал этих возможностей.

В связи с необходимостью ознакомления ответчика с указанны-

- 4 -

ми дополнениями и изменениями к исковому заявлению, поступившими в МКАС от представителя АООТ "Лукойл-Лангепаснефтегаз", слушание дела было перенесено на 15 мая 1995 г. Направленный почтой TNT ответчику документ, был вручен ему 27 марта 1995 г., о чем свидетельствует имеющееся в деле уведомление почтового ведомства.

В заседании 15 мая 1995 г. дело было рассмотрено по существу. Истец в заседании снизил сумму своего основного требования до долл. США 12.162.453-23 /с учетом уплаты ответчиком в счет погашения долга 2,5 млн. долл. США/, а также поддержал требование о начислении на эту сумму 0,1% за каждую неделю просрочки по день фактической уплаты. При этом истец изложил ранее приведенные доводы в обоснование этих требований. Кроме того, истец просил возложить на ответчика расходы по арбитражному сбору.

Ответчик, извещенный надлежащим образом о назначении слушания дела на 15 мая 1995 г., в данном заседании представлен не был.

### Мотивы решения

1. Международный коммерческий арбитражный суд при ТПП РФ признал себя компетентным рассматривать настоящий спор, исходя из п. 10 контракта N 810/01133175/15075-040/04 от 7 июля 1991 г., которым предусмотрено разрешение споров, вытекающих из данного контракта, в Арбитражном суде при Торгово-промышленной палате СССР.

Согласно п. 4 "Положения о международном коммерческом арбитражном суде при Торгово-промышленной палате Российской Федерации", являющегося приложением к Закону РФ от 7 июля 1993 г. "О международном коммерческом арбитраже", преемником Арбитражного суда при ТПП СССР является МКАС при ТПП РФ, и он вправе разрешать споры на основании соглашений сторон о передаче их споров в Арбитражный суд при ТПП СССР.

2. Факт уступки В/О "Росвнешторг" своих прав по контракту от 7 июля 1991 г. АООТ "Лукойл-Лангепаснефтегаз" подтверждается

- 5 -

заключенным между ними Соглашением от 21 февраля 1995 г.. Из материалов дела видно, что предварительно стороны получили согласие ответчика на переуступку прав, о чем свидетельствует копия его письма председателю В/О "Росвнешторг" от 15 февраля 1995 г. С учетом этих обстоятельств АООТ "Лукойл-Лангепаснефтегаз" 15 марта 1995 г. обратилось в МКАС с ходатайством о замене истца по данному делу. Копия этого письма была направлена в тот же день ответчику и согласно имеющемуся в деле почтовому уведомлению была вручена ответчику 27 марта 1995 г. Никаких возражений по этому поводу от ответчика не поступило и МКАС в заседании 15 мая 1995 г. признал АООТ "Лукойл-Лангепаснефтегаз" надлежащим истцом по делу.

3. При обсуждении вопроса о возможности слушания дела в отсутствие представителя ответчика МКАС исходил из того, что ответчик по последнему известному почтовому адресу заказным письмом от 23 марта 1995 г. был извещен о времени и месте проведения арбитражного заседания, назначенного на 15 мая 1995 г. Таким образом, следует констатировать, что арбитражем были соблюдены предписания Закона РФ от 7 июля 1993 г. "О международном коммерческом арбитраже" в части надлежащего извещения ответчика и назначении слушания дела, поскольку в силу п. 1 ст. 3 этого Закона, любое письменное сообщение считается полученным, если оно направлено по последнему известному местонахождению коммерческого предприятия или почтовому адресу адресата заказным письмом.

Согласно п. 2 § 26 Регламента Арбитражного суда неявка стороны, надлежащим образом извещенной о времени и месте проведения арбитражного заседания, не препятствует разбирательству дела, если только неявившаяся сторона до окончания разбирательства дела не потребовала отложить его по уважительной причине. Поскольку подобного требования от ответчика не поступило, МКАС счел возможным рассмотреть дело в отсутствие его представителя.

4. Обратившись к вопросу о применимом к отношениям сторон по контракту от 7 июля 1991 г. праве, МКАС установил, что сог-

- 6 -

лашение сторон по этому вопросу отсутствует.   Исходя   из   этого,
МКАС, руководствуясь п.   2 ст. 28 Закона РФ от 7 июля 1993 г.  "О
международном коммерческом арбитраже", в соответствии с коллизи-
онной нормой,   закрепленной в ст. 566 ГК РСФСР 1964 г., действо-
вавшей на момент заключения контракта,   признал,   что к   спорным
отношениям сторон,   вытекающим   из   данного контракта,   подлежит
применению право места совершения сделки,   то есть право,   дейс-
твующее в России, поскольку контракт был подписан в Москве.

5. Рассмотрев требование истца в отношении взыскания с   от-
ветчика долл. США   12.162.453-23 в погашение его задолженности за
поставленный ему товар, МКАС находит его обоснованным.

Как следует из материалов дела,   истец выполнил свои обяза-
тельства, предусмотренные контрактом от 7 июля 1991 г., поставив
ответчику 165.018,035   мт   сырой   нефти стоимостью   долл. США
21.215.956-80. Факт поставки нефти подтверждается   коносаментами
от 13 ноября 1991 г.  и от 17 декабря 1991 г.,   а стоимость пос-
тавленной нефти - предъявленными ответчику счетами N 02/2602   от
13 ноября 1991 г. и N 516/11175 от 3 июня 1992 г.

Согласно условиям контракта ответчик   должен   был   оплатить
товар в   течение 30 дней с даты коносаментов,   то есть до 13 де-
кабря 1991 г. и до 17 января 1992 г. Из материалов дела следует,
что ответчик  в установленные контрактом сроки товар не оплатил.
Так, подписанный сторонами протокол от 14 октября 1992 г. свиде-
тельствует о том,   что ответчик, подтвердив получение указанного
количества нефти и ее стоимость,   вместе с тем признал свою   за-
долженность за товар истцу в сумме долл. США 15.115.956-80,   обя-
завшись перечислить ее на счет истца с   учетом  4%  годовых · не
позднее 31 октября 1992 г. Как указано в исковом заявлении, дос-
тигнувшая к  этому  сроку   задолженность   в   сумме   долл. США
15.813.844-99, не была своевременно погашена ответчиком. Лишь 23
ноября 1993 г.,  по признанию истца, ответчик перевел в счет по-
гашения своего  долга  долл. США   1.151.391-76.   Оставшаяся часть
долга - долл. США 14.662.453-23 и составила основную сумму   иска,
первоначально предъявленную  ответчику.   В   заседании арбитража,

- 7 -

подтвердив получение от ответчика 2,5 млн.долл.США, истец снизил сумму своего основного требования до долл.США 12.162.453-23.

МКАС, известив ответчика о предъявленном к нему иске, предложил ему представить отзыв по иску, однако возражений или каких-либо объяснений по существу иска от ответчика в Суд не поступило. Между тем, как видно из имеющихся в деле материалов переписки, ответчик, признавая свою задолженность истцу, обращался к нему с просьбой об отсрочке платежа, ссылаясь, в частности, на применение к компаниям, контролируемым югославскими гражданами, санкций, введенных в Австрии в связи с принятыми Советом Безопасности ООН резолюциями по вопросу отношений с Югославией. Истец, не соглашаясь с этими доводами ответчика, утверждал, что компания, которую представляет ответчик, являясь резидентом Австрии, то есть будучи официально зарегистрированной и имеющей основной офис в Австрии, не подпадает под действие упомянутых санкций. По мнению МКАС, ответчик, судя по содержанию его переписки с истцом, никоим образом не доказал, что указанные обстоятельства дают основания для освобождения его от ответственности перед истцом. Более того, даже если бы такие основания имелись, то есть если бы не имелось со стороны ответчика вины в смысле ст. 222 ГК РСФСР 1964 г., чего МКАС, как указано выше, не усматривает, то и тогда он все равно оставался бы обязанным оплатить товар: согласно статье 244 ГК РСФСР 1964 г. в случае, если покупатель в нарушение договора откажется уплатить за купленную вещь установленную цену, продавец вправе требовать от покупателя уплаты цены.

С учетом изложенного с ответчика в пользу истца подлежит взысканию долл.США 12.162.453-23.

6. Подлежит также удовлетворению требование истца о начислении на взыскиваемую с ответчика сумму - долл.США 12.162.453-00 0,1% годовых за каждую неделю просрочки ее уплаты.

Согласно подписанному сторонами Протоколу от 14 октября 1992 г. /п. 2/ покупатель /ответчик/ обязался платить продавцу /истцу/ пени в размере 0,1% годовых за каждую неделю просрочки

погашения признанной в этом протоколе суммы долга. Поскольку в установленный в этом Протоколе срок /до 31 октября 1992 г. / ответчик не погасил свою задолженность истцу, он тем самым до настоящего времени находится в просрочке исполнения своего денежного обязательства. Этот факт не оспаривается самим ответчиком, который в переписке с истцом, в частности, в гарантийном письме от 30 марта 1993 г., признал свою обязанность не только погасить долг, но и уплатить 0,1% годовых за каждую неделю задержки платежа.

Что касается начальной даты исчисления указанных процентов, то с учетом мнения истца МКАС определил ее с 8 сентября 1994 г., имея в виду, что последнее перечисление 2,5 млн. долл. США на счет истца было произведено ответчиком 7 сентября 1994 г.

7. Поскольку в соответствии с п. 1 § 5 Положения об арбитражных сборах и расходах и об издержках сторон арбитражный сбор возлагается на сторону, против которой состоялось решение, с ответчика подлежит взысканию долл. США 27.262-00 в возмещение расходов истца по арбитражному сбору.

### Резолютивная часть решения

На основании изложенного и руководствуясь § 34 Регламента, Международный коммерческий арбитражный суд при ТПП РФ

## Р Е Ш И Л:

Обязать ответчика - фирму "Йокс Варенхандельсгезельшафт МБХ", Клагенфурт, Австрия, уплатить истцу - АООТ "Лукойл-Лангепаснефтегаз", г. Лангепас, Тюменская область, Россия, долл. США 12.162.453-23, с начислением на эту сумму 0,1% годовых за каждую неделю просрочки, начиная с 8 сентября 1994 г. по день ее фактической уплаты, а также долл. США 27.262-00 в возмещение расходов истца по арбитражному сбору.

- 9 -

Настоящее решение составлено и подписано в трех экземпля-
рах, один из которых предназначен для хранения в делах МКАС,
один для истца и один - для ответчика.


Председатель состава арбитража                    Е.А. Суханов


Арбитры:

С.Н. Лебедев                                      И.И. Гайдаенко



Двадцать девятого апреля одна тысяча девятьсот девяносто восьмого года.
Я, Поляков Андрей Викторович, нотариус поселка Быково, Раменского района
Московской обл., свидетельствую верность этой копии с копии документа, в
последней подчисток, приписок, зачеркнутых слов и иных неоговоренных ис-
правлений или каких-либо особенностей не оказалось.
Зарегистрировано в реестре за № ____
Взыскано по тарифам на основании ст.4 Закона РФ «О Государст-
венной пошлине», п.4.17. – ___ руб. ___ коп.

Нотариус                                      А. В. Поляков

**АПОСТИЛЬ ✦ APOSTILLE**
(Гаагская конвенция от 5 октября 1961 г.)
(Convention de la Haye du 5 octobre 1961)

1 Страна **РОССИЙСКАЯ ФЕДЕРАЦИЯ**
  Pays     **FÉDÉRATION DE RUSSIE**

**НАСТОЯЩИЙ ОФИЦИАЛЬНЫЙ ДОКУМЕНТ**

2 Подписан
3 Выступающим в качестве
4 Скреплен печатью/штампом

**УДОСТОВЕРЕНО**

5 В городе Москве          6  30.04.98

8 За №
9 Место печати            10 Подпись

Всего прошнуровано,
пронумеровано и скреплено
печатью – ___ листов
Нотариус

INTERNATIONAL COMMERCIAL ARBITRATION COURT
of the Chamber of Commerce and Industry of the Russian Federation

Case # 179/1994

## AWARD

City of Moscow

May 15, 1995

The International Commercial Arbitration Court of the Chamber of Commerce and Industry of the Russian Federation composed of:

presiding arbitrator    E.A. Sukhanov
and arbitrators         S.N. Lebedev and I.I.Gaidayenko

in a session held on May 15, 1995, heard

a case concerning an action brought by V/O Rosvneshtorg of Moscow, Russia, against YOX Warenhandelsgeselschaft m.b.H. of Klagenfurt, Austria, for the recovery of a sum in the amount of US $14,662,453.23.

Participating in the proceedings were:

representatives of the Claimant: L.A. Afanasyeva (by power of attorney issued May 15, 1995) and D.A. Timonin (by power of attorney issued January 31, 1995- # 34/46); representatives of the Respondent: the Respondent was notified as to the time and venue of the proceedings by means of a summons duly delivered on March 23, 1995, but failed to be represented at the proceedings; others: Reporter L.P Churakova

## Facts of the Case

On June 6, 1994, V/O Rosvneshtorg of Moscow filed with the International Commercial Arbitration Court of the Chamber of Commerce and Industry of the Russian Federation a complaint against YOX Warenhandelsgeselschaft m.b.H. of Klagenfurt for the recovery from the Respondent of a sum in the amount of US $14,662,453.23, which constituted the payment due to the Claimant for the merchandise delivered to the Respondent, and for the award of the arbitration costs.

The complaint indicates that under Contract # 810/01133175/15075-040/04 signed by the Parties on July 7, 1991, the Claimant supplied to the Respondent 165,018,035 metric tons of crude valued at US $21,215,956.80. Said quantity of crude was delivered f.o.b. Port of Novorossiysk in two shipments (the bills of lading of November 13, 1991, and December 17, 1991).

In accordance with the provisions of the Contract, the Respondent was required to pay for the merchandise delivered within 30 days of the bill of lading dates, i.e. on or before December 13, 1991, and on or before January 17, 1992, respectively.

On March 18, 1992, the Respondent deposited US $6,100,000.00 into the Claimant's account. Under the Protocol signed by the Parties on October 14, 1992, the remainder due in the amount of US $15,115,956.80 plus interest at an annualized rate of 4% was to be paid off not later than October 31, 1992. As of October 31, 1992, the total amount due including the accrued interest was US $15,614,783.37. In the event of any delay in paying off said sum, the Respondent agreed to be assessed a penalty at the rate of .1% of the overdue amount for each week of the delay.

On November 23, 1992, the Respondent deposited US $1,151,391.76 into the Claimant's account as partial payment for the merchandise delivered. The remainder of the debt, in the amount of US $14,662,453.23, was outstanding as of the day this Complaint was filed.

The Claimant deemed his rights to have been violated and filed this Complaint with the International Commercial Arbitration Court of the Chamber of Commerce and Industry of the Russian Federation under the provisions of Section 10 of the Contract.

The Respondent failed to respond to the Complaint in any way.

On February 22, 1995, the Arbitration Court received a copy of the Agreement on the transfer of rights of February 21, 1995, under which the Claimant in this case, i.e. V/O Rosvneshtorg, ceded all its legal rights with respect to the Contract of July 7, 1991, to an open-end joint-stock company, LUKoil-Langepasneftegaz. The Respondent's consent to the aforementioned transfer of rights was contained in a letter to the Claimant of February 15, 1995.

The case was set to be heard by the Arbitration Court on March 15, 1995. But on the day of the hearing, the Court received Supplements and Amendments to the Complaint signed by a representative of LUKoil-Langepasneftegaz.

The Claimant's representative reported that after the Complaint had been filed, the Respondent paid the Claimant an additional US $2,500,000 so that the amount of the outstanding principal ought to be reduced accordingly.

Referring to the correspondence between the Parties prior to the arbitration proceedings, the Claimant's representative noted that the Respondent, while acknowledging its unfulfilled obligation to the Claimant on numerous occasions, in its letters of January 29, 1993, and November 4, 1993, ascribed its non-performance to the embargo on all transactions involving the accounts of former Yugoslav citizens and the

companies under their control introduced by the government of Austria for the purpose of complying with the UN Security Council Resolutions #757 of May 30, 1992, and #820 of April 17, 1993. The Claimant's representative explained that while YOX was indeed owned by Yugoslav citizens, R. Radulovic, the company's president, and his wife, Ya. Radulovic, who is currently the sole owner of YOX, companies of that kind were exempt from the embargo and hence the stated reason for the Respondent's non-performance of its obligation could not be deemed valid. On the strength of the above, the Claimant's representative stated his belief that the Respondent was in a position to pay in full for the merchandise delivered both prior to the imposition of the sanctions by the UN and the Austrian government and during the period said sanctions were in effect, because they in no way constrained the business activities of the Respondent's company. The Respondent, however, failed to make use of the available opportunities.

Considering the need for the Respondent to familiarize itself with said Supplements and Amendments to the Complaint filed with the Arbitration Court by the representative of LUKoil-Langepasneftegaz, the hearing date was moved back to May 15, 1995. The document sent to the Respondent by registered mail was delivered on March 27, 1995, as attested by the postal receipt attached to the case.

In its session on May 15, 1995, the Arbitration Court examined the case on its merits. During the proceedings, the Claimant agreed to reduce the principal amount overdue to US $12,162,453.23 (reflecting the Respondent's payment of US $2,500,000 toward the retirement of its obligation) and also demanded that a penalty at the rate of .1% of the outstanding amount be assessed for each week of the delay up until the day the debt has actually been paid off in its entirety. In support of its demands, the Claimant set forth the arguments described hereinabove. In addition, the Claimant requested that the arbitration costs be charged to the Respondent.

The Respondent was duly notified that the case would be heard on May 15, 1995, but failed to be represented at said proceedings.

## Opinion of the Arbitration Court

1.      The International Commercial Arbitration Court of the Chamber of Commerce and Industry of the Russian Federation deemed itself competent to hear this dispute in accordance with Section 10 of Contract # 810/01133175/15075-040/04 of July 7, 1991, under which all disputes or claims arising out of this Contract shall be finally and exclusively settled by the Arbitration Court of the Chamber of Commerce and Industry of the USSR.

According to Section 4 of the "Rules of Procedure for the International Commercial Arbitration Court of the Chamber of Commerce and Industry of the Russian Federation," a supplement to the Russian Federation Law On International Commercial Arbitration of July 7, 1993, the International Commercial Arbitration Court of the Chamber of Commerce and Industry of the Russian Federation is a lawful successor to the Arbitration Court of the Chamber of Commerce and Industry of the USSR and as such is empowered to settle disputes which the Parties agreed to submit to the Arbitration Court of the Chamber of Commerce and Industry of the USSR.

2.      The cession by V/O Rosvneshtorg of its rights under the Contract of July 7, 1991, to LUKoil-Langepasneftegaz is confirmed by the Agreement between the Parties signed on February 21, 1995. It is clear from the case material that the Parties secured in advance the Respondent's consent to said cession of rights, as evidenced by a

4

copy of the Respondent's letter to the Chairman of V/O Rosvneshtorg of February 15, 1995. With these circumstances in mind, on March 15, 1995, LUKoil-Langepasneftegaz petitioned the International Commercial Arbitration Court of the Chamber of Commerce and Industry of the Russian Federation for a change of one claimant for another in this case. A copy of said letter was mailed to the Respondent that very day and was delivered to the Respondent on March 27, 1995, as attested by the postal receipt attached to the case. No counter-case was received from the Respondent, and the International Commercial Arbitration Court of the Chamber of Commerce and Industry of the Russian Federation in its session on May 15, 1995 recognized LUKoil-Langepasneftegaz as a proper claimant in this case.

3.     The International Commercial Arbitration Court of the Chamber of Commerce and Industry of the Russian Federation based its decision to hear the case with no representative of the Respondent in attendance on the fact that the latter was notified as to the time and venue of the arbitration proceedings set for May 15, 1995, by means of a registered letter of March 23, 1995, sent at the Respondent's last known mailing address. It is thus established that the arbitrators complied with the provisions of the Russian Federation Law on International Commercial Arbitration of July 7, 1993, concerning the appropriate procedure for notifying the respondent and setting the date of the hearing, since under Section 3.1 of said law any written notice shall be deemed to have been duly delivered if sent by registered mail at the last known whereabouts of the commercial entity or the addressee's mailing address.

Under Section 2, Paragraph 20 of the Rules of the Arbitration Court, failure of any party duly notified as to the time and venue of the arbitration proceedings to appear at same shall not prevent the case from being heard unless the non-attending party requests, prior to the end of the hearing, to defer the proceedings and cites a valid reason for its request. Insofar as no request of this kind was advanced by the Respondent, the International Commercial Arbitration Court of the Chamber of Commerce and Industry of the Russian Federation saw fit to hear the case with no Respondent's representative in attendance.

4.     With respect to the applicable law to govern the relationship of the Parties under the Contract of July 7, 1991, the International Commercial Arbitration Court of the Chamber of Commerce and Industry of the Russian Federation found that no relevant agreement of the Parties existed. With this in mind, the International Commercial Arbitration Court of the Chamber of Commerce and Industry of the Russian Federation found, pursuant to Section 28.2 of the Russian Federation Law on International Commercial Arbitration of July 7, 1993, and in accordance with the rules governing choice of laws as set forth in Article 566 of the RSFSR Civil Code of 1964 that was in effect as of the Contract Signature Date, that the conflicting relationship of the Parties arising out of this Contract shall be governed by the law of the transaction venue, i.e. the law of the Russian Federation, inasmuch as the Contract was signed in Moscow.

5.     Having heard the Claimant's case for the recovery of US $12,162,453.23 owed by the Respondent for the merchandise delivered thereto, the International Commercial Arbitration Court of the Chamber of Commerce and Industry of the Russian Federation finds the demand valid.

As follows from the case material, the Claimant fulfilled its obligations under the Contract of July 7, 1991, by delivering to the Respondent 165,018.035 metric tons of crude valued at US $21,215,956.80. The delivery is confirmed by the bills of lading dated November 13, 1991 and December 17, 1993, while the value of the crude

delivered by the bills presented to the Respondent for payment (invoices #02/2602 of November 13, 1991, and # 516/11175 of June 3, 1992).

Under the provisions of the Contract, the Respondent was required to pay in full for the merchandise delivered within 30 days of the bill of lading dates, i.e. prior to December 13, 1991, and prior to January 17, 1992, respectively. It follows from the case material that the Respondent failed to pay for the merchandise delivered within the time frame set in the Contract. Thus, the Protocol signed by the Parties on October 14, 1992, attests that the Respondent, while acknowledging the delivery of the aforementioned quantity of crude and its value, at the same time acknowledged its unmet obligation to the Claimant for the merchandise delivered in the amount of US $15,115,956.80 by pledging to pay said sum plus accrued interest at an annualized rate of 4% not later than October 31, 1992. The Complaint states that the Respondent failed to pay off its debt that by said date had increased to US $15,813,844.99. It was not until November 23, 1993, that the Respondent paid the Claimant, as the latter acknowledges, US $1,151,391.76 toward retiring its debt. The remainder of the debt, US $14,662,453.23, constituted the principal amount of the original claim pressed against the Respondent. In the course of the proceedings, the Claimant confirmed the payment of US $2,500,000 by the Respondent and reduced the amount of its principal claim to US $12,162,453.23.

The International Commercial Arbitration Court of the Chamber of Commerce and Industry of the Russian Federation notified the Respondent of the action brought against it and solicited its comments thereon, but the Respondent failed to submit its defense or any explanations concerning the merits of the claim. Meanwhile, as evidenced by the correspondence attached to the case, the Respondent acknowledged its obligation to the Claimant and appealed for a payment deferral, claiming, *inter alia*, hardship caused by the sanctions imposed by Austria on companies controlled by Yugoslav citizens in compliance with the pertinent UN resolutions. The Claimant rejected the Respondent's arguments, averring that the company represented by the Respondent was an Austrian resident, i.e. it was officially registered and had its main office in Austria, and as such was exempt from said sanctions. The International Commercial Arbitration Court of the Chamber of Commerce and Industry of the Russian Federation finds that the Respondent, judging by the contents of its correspondence with the Claimant, failed to prove in any way that the aforementioned circumstances relieved it from its obligations to the Claimant. Moreover, even if there were grounds for such relief, i.e. if the Respondent were not to blame for non-performance under Article 222 of the RSFSR Civil Code of 1964, which, as stated above, is not the case in the opinion of the International Commercial Arbitration Court of the Chamber of Commerce and Industry of the Russian Federation, the Respondent would still have to pay for the merchandise delivered in accordance with Article 244 of the RSFSR Civil Code of 1964: in the event the buyer refuses to pay the agreed-upon price for a purchased item, the seller shall have the right to demand the payment from the buyer.

In view of the above, the Claimant is hereby awarded the recovery from the Respondent of US $12,162,453.23.

6.    Likewise, the Claimant is hereby awarded the interest on the sum to be recovered from the Respondent, i.e. US $12,162,453.23, at an annualized rate of .1% for each week of payment delay.

Under the Protocol signed by the Parties on October 14, 1992 (Section 2), the buyer (Respondent) undertook to pay the seller (Claimant) a penalty at an annualized rate of .1% for each week of delay in paying off the sum of the debt recognized in that

Protocol. Since the Respondent failed to pay off its debt to the Claimant within the time frame set forth in said Protocol (till October 31, 1992), it is *ipso facto* in delay in the performance of its financial obligation. This fact is not challenged by the Respondent who acknowledged, in its correspondence with the Claimant, *inter alia*, in the letter of guarantee of March 30, 1993, its obligation to pay interest at an annualized rate of .1% for each week of payment delay as well as to pay off the principal amount of the debt.

As for the initial date of accrual of said interest, the International Commercial Arbitration Court of the Chamber of Commerce and Industry of the Russian Federation, taking into account the Claimant's opinion, sets it at September 8, 1994, considering that the last payment into the Claimant's account of US $2,500,000 was made by the Respondent on September 7, 1994.

7.    In view of the fact that pursuant to Section 1, Paragraph 5 of the Rules on Arbitration Costs and Expenses and the Parties' Costs the arbitration costs shall be charged to the losing party, the Claimant is hereby awarded arbitration costs in the amount of US $27,262.00 to be recovered from the Respondent.

<u>Decree of the Arbitration Court</u>

On the strength of the above and in accordance with Paragraph 34 of the Rules, the International Commercial Arbitration Court of the Chamber of Commerce and Industry of the Russian Federation

R U L E S:

To obligate the Respondent, YOX Warenhandelsgesellschaft m.b.H., Klagenfurt, Austria, to pay to the Claimant, LUKoil-Langepasneftegaz, Langepas, Tyumen Region, Russia, US $12,162,453.23 plus interest at an annualized rate of .1% for each week of the delay accruing from September 8, 1994, to the day the above sum is actually paid off, plus US $27,262.00 to compensate the Claimant for the arbitration costs it incurred.

This award is executed and signed in three counterparts, one counterpart to be deposited in the Records of the International Commercial Arbitration Court of the Chamber of Commerce and Industry of the Russian Federation, and one each for the Claimant and the Respondent.

Presiding arbitrator                                    E.A. Sukhanov.

Arbitrators

S.N. Lebedev                                           I.I. Gaidayenko

I, Ilya D. Levin, professional translator, residing at 430 M St., S.W., # N-202, Washington, D.C., hereby certify that the foregoing is a true and faithful translation of the original document.

Subscribed and sworn to, before me,
this ____ day of _____ 19 _6

Signature

HARRIS S. AMMERMAN
Notary Public, District of Columbia
My Commission Expires November 14, 1999



# С О Г Л А Ш Е Н И Е

о переуступке прав по контракту N 810/01133175/15075-040/04, подписанного 7 июля 1991 г. между В/О "Росвнешторг" и австрийской фирмой "YOX WARENHANDELSGESELLSCHAFT m.b.H."

Акционерное общество открытого типа "Лукойл-Лангепаснефтегаз" (в дальнейшем "Общество") в лице Афанасьевой Л.А., действующей на основании доверенности, с одной стороны и Внешнеэкономическое объединение "Росвнешторг" (в дальнейшем "Росвнешторг") в лице Генерального директора Брюховецкого В.Ф., действующего на основании устава, с другой стороны, руководствуясь положениями части 4 статьи 411 Гражданского Кодекса РФ 1964г. и статьи 382 Гражданского кодекса РФ 1994г., договорились о нижеследующем:

1.  Росвнешторг, являясь стороной по контракту от 7 июля 1991г. с австрийской фирмой "YOX WARENHADELSGESELLSCHAFT m.b.H.", (далее - "Фирма") все права требования, вытекающие из вышеуказанного контракта, переуступает Обществу.

2.  Общество принимает на себя все переуступленные права требования согласно пункту 1 настоящего Соглашения.

3.  Стороны констатируют, что согласие Фирмы на передачу прав по вышеуказанному контракту Обществу имеется (письмо Фирмы от " /5 " февраля 1995 г.)

4.  Все расчеты между сторонами осуществляются на основе подписанных документов и настоящее соглашение не влияет на размер причитающихся Росвнешторгу средств за проданную в рамках указанного контракта экспортную нефть.

5.  Стороны в течение 10 дней направят письма-уведомления о замене лиц в договоре всем заинтересованным третьим лицам, включая Фирму.

Росвнешторг передаст Обществу все необходимые документы по контракту в оригинале, включая упомянутый контракт, переписку по ходу исполнения контракта и т.д.

6.  В случае необходимости Росвнешторг окажет Обществу содействие в переоформлении контракта в банковских учреждениях.

7. Соглашение вступает в силу с даты его подписания и будет действовать до полного окончания расчетов между всеми сторонами.

8. Соглашение подписано "2/" февраля 1995 г. в Москве в 5 экземплярах по одному для каждой из сторон, одному для Фирмы и одному для уполномоченных банков, обслуживающих стороны.

9. Все споры и разногласия, вытекающие из настоящего Соглашения, будут урегулироваться путем переговоров. Если спор не будет урегулирован таким путем, то он подлежит передаче на разрешение Арбитражного Суда г.Москвы.

10. Юридические адреса Сторон:

АООТ "ЛУКойл - Лангепаснефтегаз":            626449,   Тюменьская    обл.,
                                             г.Лангепас,  ул.Ленина,  дом
                                             11-а.

Российское внешнеэкономическое
объединение "Росвнешторг":                   123242,   г.   Москва,
                                             ул.Баррикадная, дом 8/5.

ЗА "ЛУКойл-ЛАНГЕПАСНЕФТЕГАЗ"                    ЗА "РОСВНЕШТОРГ"

*«22» апреля* 1998 *года. Я, Поляков Андрей Викторович, нотариус поселка Быково, Раменского района Московской обл., свидетельствую верность этой копии с подлинником документа, в последнем подчисток, приписок, зачеркнутых слов и иных неоговоренных исправлений или каких-либо особенностей не оказалось.*

Зарегистрировано в реестре за № *2502*

Взыскано по тарифам на основании ст.4 Закона РФ «О Государственной пошлине», п.4.17. – *1* руб. *64* коп.

Нотариус　　　　　　　　　　　　　　　　　　　　　А. В. Поляков

# AGREEMENT

on assignment in accordance with Contract # 810/01133175/15075-040/04 executed on July 7, 1991 between VO "Rosvneshtorg" and the Austrian Company "YOX WARENHAN-DELSGESELLSCHAFT m.b.H."

The Public Company "Lukoil-Langepasneftegaz", hereinafter referred to as "the Company Lukoil" in person of L. A. Afanasieva acting with the authority of a Power of Attorney, on the one hand, and External Economic Association "Rosvneshtorg", hereinafter referred to as "Rosvneshtorg" in person of the General Director V. F. Briukhovetsky acting with the authority of Articles of Association, on the other hand, in accordance with the regulations of Section 4, article 411, the RF Civil Code of 1964 and article 382 of the RF Civil Code of 1994 have agreed about the following:

1.    Rosvneshtorg being an interested  Party under the Contract concluded on July 7, 1991 with the Austrian Company "YOX WARENHADELSGESELLSCHAFT m.b.H." (hereinafter referred to as "the Company YOX") will assign all the claims arising from the said Contract to the Company Lukoil.

2.    The Company Lukoil  shall accept all the claims assigned in accordance with paragraph 1 of this Agreement.

3.    The Parties declare that the agreement of the Company Yox in relation to assigning claims under the aforesaid Contract is available. (letter  of the Company Yox, dated: February 15, 1995).

4.    All settlements between the Parties shall be executed on the basis of the documents signed, and this Contract does not affect the amount of monies to be paid to Rosvneshtorg for the oil sold under the said Contract.

5.    The Parties shall within 10 days send all interested third persons, including the Company Yox, letters-notifications about the Parties change in the Contract.

Rosvneshtorg shall transfer the Company all the necessary documents in accordance with the Contract in the original, including the Contract mentioned, correspondence on the Contract implementation etc.

6.    If necessary, Rosvneshtorg shall assist the Company Lukoil in re-execution of the Contract in banking enterprises.

7.    The Agreement becomes valid since the date of its signing and will be effective till settlements completion between the Parties.

8.    This Agreement is executed on February 21, 1995 in Moscow in 5 copies, one for each Party, one for the Company Yox and one for each Authorized Banks servicing the Parties.

9.    All differences arising from this Agreement shall be settled by negotiations. If any differences cannot be regulated the said way, they are subject to transference to Moscow Arbitration for settlement.

10.    Legal addresses of the Parties:

AOOT "Lukoil-Langepasneftegaz"    626449, Tiumenskaya region, the town of Langepas, Lenin street, house 11-a

External Economic Association "Rosvneshtorg"    123242, Moscow, Barrikadnaya street, house 8/5

For and on behalf of          For and on behalf of

AOOT          "Lukoil-    VO "Rosvneshtorg"
Langepasneftegaz"
                              *(signature)*
*(signature)*

                              *(Seal)*
*(seal)*


*April "22", 1998. I, Poliakov Andrey Victorovich, notary village of Bykovo Ramensky district, Moscow region, certify that this is a true copy of the original document in which no erasures, additions, crossed words and other unstipulated corrections or peculiarities have been discovered.*
     *Register No 2502*
     *Fee paid   Rub 7.64   .- according to the Russian Federation Fee Act, Art. 4, p. 4.17.*

     *Notary        (signed)        A. V. Poliakov*

          *The Notary Seal*

Переводчик                        Трофимов Е. С.

«22» апреля 1998 г. Я, Поляков Андрей Викторович, нотариус поселка Быково Раменского района Московской области, свидетельствую подлинность подписи, сделанной лично мне известным переводчиком Трофимовым Евгением Семёновичем.

Зарегистрировано в реестре за № 2503

Взыскано по тарифам на основании ст. 4 Закона РФ «О государственной пошлине», п. 4.18, – 4 руб. 18 коп.

Нотариус                                                        А. В. Поляков



АПОСТИЛЬ ✦ APOSTILLE

(Гаагская конвенция от 5 октября 1961 г.)

(Convention de la Haye du 5 octobre 1961)

1. Страна РОССИЙСКАЯ ФЕДЕРАЦИЯ Нст. кик
Pays FÉDÉRATION DE RUSSIE + перевод

НАСТОЯЩИЙ ОФИЦИАЛЬНЫЙ ДОКУМЕНТ

2. Подписан Поляковым А.В.
(фамилия)

3. Выступающего в качестве нотариуса
(должность)

4. Скреплён печатью/штампом нотариус пос.
(официального)
Быково Раменского рна Москов
название учреждения) области

УДОСТОВЕРЕНО

6. В городе Москве       6. 22. 04. 1998
(дата цифрами)

7. Бизкунова С.С. и специалист
(фамилия, должность лица)
Управления юстиции АМО
название удост. органа (вышестоящего органа)

8. За № 5043

9. Место печати      10. Подпись

The ____ civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**98-8309**
**CIV-MOORE**
**MAGISTRATE JUDGE**
**BANDSTRA**

## I (a) PLAINTIFFS

LUKOIL-LANGEPASNEFTEGAZ

## DEFENDANTS

YOX WARENHANDELSGESELLSCHAFT M.B.H., a foreign corporation, RAMOIL HOLDING COMPANY, a Cayman Island company; RAMOIL MANAGEMENT CO. RODOLJUB RADULOVIC & JASNA RADULOVIC

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT ____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Sharon L. Kegerreis
Zuckerman, Spaeder, Taylor & Evans, LLP
201 South Biscayne Boulevard, # 900
Miami, FL 33131
Tel: 305-579-0110

A-WPB/ 98 CV 8309/ Moore/ Bandstra

ATTORNEYS (IF KNOWN)

FILED by ____
CARLOS
CLERK, U.S. DIST. CT.
S.D. OF FLA.
98 MAY 13 PM ____
JC

**(d)** CIRCLE COUNTY WHERE ACTION AROSE:
DADE, MONROE, BROWARD, PALM BEACH, MARTIN, ST. LUCIE, INDIAN RIVER, OKEECHOBEE, HIGHLANDS

## II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)

- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

9 U.S.C. Section 203. This is an action for the recognition and enforcement of a foreign arbitral award.

IVa. **5** days estimated (for both sides) to try entire case.

## V. NATURE OF SUIT (PLACE AN x IN ONE BOX ONLY)

**A CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- B ☐ 151 Medicare Act
- B ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- B ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability

**A REAL PROPERTY**
- B ☐ 210 Land Condemnation
- B ☐ 220 Foreclosure
- B ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**A TORTS**
*PERSONAL INJURY*
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

**A CIVIL RIGHTS**
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 440 Other Civil Rights

*PERSONAL INJURY*
- ☐ 362 Personal Injury— Med Malpractice
- ☐ 365 Personal Injury— Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

*PERSONAL PROPERTY*
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- B ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**B PRISONER PETITIONS**
- ☐ 510 Motions to Vacate Sentence
  *Habeas Corpus:*
- ☐ 530 General
- ☐ 535 Death Penalty
- B ☐ 540 Mandamus & Other
- ☒ 550 Civil Rights
- ☐ 555 Prison Condition

**B FORFEITURE/PENALTY**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**A LABOR**
- ☐ 710 Fair Labor Standards Act
- B ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt. Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- B ☐ 791 Empl. Ret. Inc. Security Act

**A BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**A PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**B SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**A FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**A OTHER STATUTES**
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce/ICC Rates/etc.
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900 Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes
- ☒ 890 Other Statutory Actions

*A or B*

## VI. ORIGIN (PLACE AN x IN ONE BOX ONLY)

- ☐ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☒ 4 Refiled
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

*A or B*

## VII. REQUESTED IN COMPLAINT:
CHECK IF THIS IS A **CLASS ACTION**
☐ UNDER F.R.C.P. 23

DEMAND $ **$12,216,977.23**

Check YES only if demanded in complaint:
**JURY DEMAND:** ☐ YES ☒ NO

## VIII. RELATED CASE(S) IF ANY (See instructions)

JUDGE ____ DOCKET NUMBER ____

DATE
7 May 1998

SIGNATURE OF ATTORNEY OF RECORD
*Sharon J. Kegerreis*

FOR OFFICE USE ONLY: Receipt No. 692082 Amount: 150.00
Date Paid: 05/13/98 M/ifp: ____

____ STATES DISTRICT COURT
-2
5/90